## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**BRENDON SCHOONOVER,**

      **Plaintiff**

                                   **Case No. 1:18–cv–302**

      **v.**                         **JUDGE DOUGLAS R. COLE**

**SHERIFF K.R. ROGERS, et al.,**

      **Defendants.**

## <u>OPINION AND ORDER</u>

This cause is before the Court pursuant to Defendants' Motion for Summary Judgment (Doc. 49). The Court held oral argument on that Motion on May 6, 2021. In this action, Schoonover claims that Defendants are liable for injuries that Schoonover suffered as a result of a jail-cell assault committed by other inmates. The question before the Court at the summary judgment stage, though, is whether Schoonover raises a genuine dispute of material fact that requires jury resolution. For the reasons discussed more fully below, the Court concludes that he does not. Thus the Court **GRANTS** Defendants' Motion (Doc. 49).

## FACTUAL BACKGROUND

This case concerns injuries that Brendon Schoonover suffered while imprisoned in the Adams County Jail. In April 2016, Schoonover was serving a 90-day sentence for committing criminal damaging in violation of Ohio Revised Code § 2909.06. (Def. Statement of Proposed Undisputed Facts ("SPUF"), Doc. 49-1,

#1337).[1] That offense, however, was not Schoonover's first run-in with the legal system, a relevant fact for reasons addressed below. (*Id.*). In 2005, Schoonover had been convicted of sexual battery in violation of Ohio Revised Code § 2907.03(B). (*Id.*). That earlier offense involved a young girl (approximately fifteen years old at the time), who was residing with Schoonover and his then-wife (the victim's legal guardian). (*Id.*). Schoonover served no jail time for the sexual battery offense, but had to complete a six-month residential sex-offender treatment program, along with a five-year term of community control and registration as a sex offender. (*Id.*). During that five-year term, Schoonover also was convicted (in 2009) for failure to register as a sex offender. (*Id.* at #1338). Four years after that, in 2013, Schoonover was convicted of failing to notify the Sheriff about a change of address, and he received a year-long prison sentence on that charge. (*Id.*). Also in 2013, Plaintiff pled guilty to a theft offense and received a 15-month prison sentence. (*Id.*).

When Schoonover arrived at the Adams County Jail on April 4, 2016, Officer Alexa McClanahan oversaw Schoonover's intake process. (*Id.* at #1337). After Schoonover filled out the requisite paperwork, Officer McClanahan assigned Schoonover to "the Middle 4 cell" on the Adams County Jail's second floor. (*Id.* at #1338). At the time, the corrections facility staff typically attempted to house sex offenders in smaller cells, like the "Middle 4 cell," at least when possible. (*Id.*; *see also*

---

[1] Defendants attached a Statement of Proposed Undisputed Facts to their Motion for Summary Judgment (Doc. 49-1). Plaintiff filed a response (Doc. 57-1) admitting (albeit with some commentary) to all but three of the proposed facts. Unless otherwise indicated, the Court's citations to Defendants' Statement of Proposed Undisputed Facts only encompass facts to which Plaintiff admitted.

Pl. Resp. to Def. Proposed Undisputed Facts, Doc. 57-1, #1954). The next day, Adams County Jail staff relocated Schoonover (along with other inmates) to the Shelby County Jail. (SPUF, Doc. 49-1, #1338). Schoonover remained at that facility from April 5, 2016, until May 8, 2016, when he returned to the Adams County Jail. (*Id.*). This time corrections officers placed Schoonover in the "End 4" cell, which is another type of smaller cell that corrections officers use for sex offenders, among other types of prisoners. (*Id.*; *see also* Pl. Resp. to Def. Proposed Undisputed Facts, Doc. 57-1, #1955). On May 13, 2016, Corrections Officer Kate Arnold reassigned Schoonover back to the Middle 4 cell in which he previously had resided. Inmate Clinton Waters also inhabited that cell. (SPUF, Doc. 49-1, #1339). Schoonover and Waters shared the cell without incident for five days. (*Id.*).

Then, on May 18, 2016, female inmates housed in a different cell at the Adams County Jail engaged in a physical altercation. As a result of that skirmish, corrections staff rearranged the housing assignments for prisoners of both sexes in order to separate the female inmates involved in the fight. (*Id.* at #1339). They did so because jail policy required that inmates involved in a fight be separated and placed in different cells. (*Id.*).

In undertaking the rearrangement, jail staff also had to account for overcrowding. The Adams County Jail has a stated capacity of 38 inmates, but held over 60 inmates at the time of the incident. (*Id.* at #1343; Rogers Dep., Doc. 47-24, #966). Prior to Schoonover's 2016 incarceration, the County had received reports about the jail's overcrowded condition, and the Adams County Sheriff, K.R. Rogers,

3

had explored and implemented various policy changes to address the longstanding overcrowding. (*Id.*). But overcrowding at the Adams County Jail still persisted, at least as of May 2016.

The Adams County Jail also followed a policy directing corrections personnel to consider, at least informally, offender characteristics in the re-housing process. To be clear, the Adams County Jail did not employ a formal classification system, i.e., one that sorts inmates by their propensity for violence or the nature of their offenses. (*See* Rogers Depo., Doc. 47-24, #957). Although the Jail Administrator, Lieutenant Micah Poe, had devised a draft classification system, the Adams County Jail never implemented a formal policy. (*See* Poe Depo., Doc. 47-22, #815–19). That being said, corrections officers used a system of informally separating at-risk inmates, such as sex offenders, from the general prison population when possible. (*Id.* at #834).

As a result of the altercation on May 18, 2016, jail officials decided to use the Middle 4 cell to house female prisoners. That meant the residents of the Middle 4 cell, including Schoonover and Waters, had to be relocated to a different cell. (SPUF, Doc. 49-1, #1339). Eventually, at approximately 9:30 a.m. that day, Defendant Deputy Corrill moved Schoonover into the Middle 8 cell on the jail's third floor. (*Id.*). At roughly that same time, Corrill reassigned Waters to the Middle 8 cell, as well. (*Id.*). As its name suggests, that cell contained eight bunks. (*Id.*). Due to overcrowding, however, the Middle 8 cell housed thirteen inmates after the reassignment process concluded. As a result, Schoonover was not assigned to a bunk, but was provided a mat to sleep on. (*Id.* at #1340).

4

Schoonover's relocation to the Middle 8 cell seemed to be working at first. For example, Schoonover received and ate his lunch inside the Middle 8 cell sometime in the early afternoon that day without incident. (*Id.*). But, around lunchtime, Steven Sturgill, another inmate housed in the Middle 8 cell, participated in a telephone call that dramatically impacted the course of events. During that call he apparently learned about, or at least discussed, Schoonover's prior sex offenses. (*Id.* at #1339). That is when the trouble began.

After returning to the Middle 8 cell from his telephone call, Sturgill referred to Schoonover as a "sex offender" and a "child molester." (*Id.*). Then someone, perhaps Sturgill, perhaps Waters, or perhaps another inmate, moved Schoonover's mat to a location near the Middle 8 cell's toilet, which placed the mat outside the view of the surveillance camera. (*Id.* at #1340). After that, Sturgill, Waters, and other inmates physically assaulted Schoonover at various times throughout the day. (*Id.*). The perpetrator inmates, including Waters, were later criminally prosecuted for that abuse. (*Id.*).

It appears that Waters initiated the violence against Schoonover. Waters struck his first blow after the corrections officers passed out dinner trays to inmates, which occurred at or around 4:38 p.m. (*Id.* at #1341). Sometime after the inmates finished eating that meal, Waters jumped from a picnic table in the cell onto Schoonover. (*Id.*). That attack occurred near the toilet area, outside the view of surveillance cameras. (*Id.*). Then Schoonover moved (or his cellmates moved him) to

the shower, where various inmates punched him, fracturing Schoonover's jaw in the process. (*Id.*).

Notably, this was not the first time Waters was involved in violence while incarcerated at the Adams County Jail, nor was it the first time he assaulted a fellow inmate with a sex offender history. Waters testified that he had been in at least three prison fights with sex offender inmates, and that he told Adams County Jail staff about those incidents. (Waters Depo., Doc. 47-4, #338). Indeed, Waters stated that just two days before the attack on Schoonover, Waters "hurt [inmate] Michael Sapp real bad for being a sex offender," and the corrections officers "knew it." (*Id.* at #339). Even so, Waters and Schoonover had resided together for five days without a hitch before they were assigned to the Middle 8 cell.

Regarding the attack on Schoonover, Schoonover estimated that he spent about two hours in the shower and testified that, from that position, he could not tell whether corrections officers conducted their scheduled observation checks. (SPUF, Doc. 49-1, #1341; Schoonover Dep., Doc. 47-1, #229). Adams County Jail policy required its corrections officers to conduct such checks every sixty minutes. (SPUF, Doc. 49-1, #1343). Defendant Deputy Corrill was on duty that day and had responsibility for the observation checks. (*Id.* at #1342).

Another inmate in the Middle 8 cell testified that the inmates attacked Schoonover in "spurts." (Mason Depo., Doc. 47-10, #510). When they heard corrections officers approaching, they would "hide [Schoonover] away" and commanded him not

to alert the guards. (*Id*.). In short, the inmates did their best to hide their attack on Schoonover from the Adams County Jail staff.

Instead of alerting guards or other jail staff, Schoonover admits he resigned himself to "just suffer through" the beating without making "much noise." (SPUF, Doc. 49-1, #1341; Schoonover Dep., Doc. 47-1, #232). Even so, Schoonover cites Waters' testimony that, at certain points during the attack, Schoonover was "screaming for his life." (Pl. Resp. to Def. Proposed Undisputed Facts, Doc. 57-1, #1955 (citing Waters Dep., Doc. 47-4, #308)). Eventually prison staff removed Schoonover from the cell around 7:40 p.m. that evening. (SPUF, Doc. 49-1, #1341). They did so after a prisoner tipped off a corrections officer, Kate Arnold, about the assault on Schoonover. (*Id*. at #1341–42).

After Schoonover's removal from the Middle 8 cell, corrections officers transferred him to the Adams County Regional Medical Center, and then the University of Cincinnati Medical Center, to receive treatment. (*Id*. at #1342). The University of Cincinnati Medical Center discharged him the next day on May 19, 2016, and Defendant Deputy Kenny Corrill transported Schoonover back to the Adams County Jail. (*Id*.).

## PROCEDURAL BACKGROUND

In his Complaint, Schoonover asserts claims under 42 U.S.C. § 1983 against various employees of the Adams County Sheriff's Office. This suit named Sheriff Rogers in his individual and official capacities, and the employees of the Sheriff's office in their individual capacities only. (Compl., Doc. 1, #2). Schoonover alleges that

7

Defendants failed to protect him while he was in their custody in the Adams County Jail, and he also claims that the Sheriff's policies and practices regarding prison staffing and inmate classification resulted in his injuries. (*Id.* at #6). Specifically, Schoonover claims that Sheriff Rogers adopted a policy and practice of (1) "operating a jail with a thoroughly deficient classification system that fails to separate inmates by, among other things, propensity for violence, and assign them to cell locations that protect inmate safety"; (2) operating an overcrowded jail; (3) employing a "deficient system of monitoring inmates that would assure their safety, in particular monitoring wholly inadequate for overcrowded cells"; and (4) understaffing the Adams County Jail. (*Id.* at #5). As for the individual corrections officers, Schoonover contends they were "reckless in their failure to protect Plaintiff Schoonover" because they failed to prevent or intervene during the inmates' attack on Schoonover. (*Id.* at #6). Based on that, Schoonover asserts that Defendants violated his Due Process Clause rights under the Fourteenth Amendment. After filing the Complaint, though, Schoonover voluntarily dismissed all Defendants except Rogers and Corrill. (Doc. 36).

With discovery now closed, the two remaining Defendants have moved for summary judgment on Schoonover's § 1983 claim. First, they allege that Schoonover failed to cite the Eighth Amendment in his Complaint, which means Schoonover cannot assert an Eighth Amendment claim for the first time in response to Defendants' summary judgment motion. (Mot. for Summ. J., Doc. 49, #1328). Next, Defendants assert that Schoonover cannot identify a dispute of material fact relating to any Defendant's individual liability. (*Id.* at #1329–32). Defendants argue that (1)

Rogers was not present in the Adams County Jail during the attack on Schoonover; (2) Rogers did not implement policies resulting in a deprivation of Schoonover's constitutional rights; (3) no evidence shows that any inmate posed a serious threat to Schoonover at the time of his assignment to the Middle 8 cell or that Corrill was aware of such a threat, meaning Corrill did not act with deliberate indifference to Schoonover's safety; and (4) Corrill's shift ended before at least some (if not all) of the violence, and the inmates hid the attack from the correctional officers, meaning that Corrill was not reckless in failing to protect Schoonover. (*Id.*).

As for municipal liability, Defendants argue that Schoonover cannot hold Adams County liable because none of its employees committed a constitutional violation. (*Id.* at #1332). Additionally, Defendants assert that Schoonover cannot identify a county custom or policy that caused the deprivation of Schoonover's constitutional rights. (*Id.* at #1332–35). In short, Defendants claim that the jail's policies regarding overcrowding, prisoner observation, and prisoner classification are not so deficient as to violate the Eighth Amendment.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to conclusively show that no genuine issue of material fact exists. *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). Once the movant presents evidence to meet its burden, the nonmoving party may not rest on its pleadings, but must come forward with

significant probative evidence to support its claim. *Celotex*, 477 U.S. at 324; *Lansing Dairy*, 39 F.3d at 1347.

This Court is not obliged to search the record sua sponte for genuine issues of material fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996); *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404–06 (6th Cir. 1992). The burden falls upon the nonmoving party to "designate specific facts or evidence in dispute." *Jordan v. Kohl's Dep't Stores, Inc.*, 490 F. App'x 738, 741 (6th Cir. 2012) (quotation omitted). If the nonmoving party fails to make the necessary showing for an element upon which it bears the burden of proof, then the moving party is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Granting summary judgment depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). In sum, the nonmoving party, at this stage, must present some "sufficient disagreement" that would necessitate submission to a jury. *See Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In making that determination, though, this Court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("In arriving at a resolution, the

court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

## LAW AND ANALYSIS

Section 1983 does not create any substantive rights, but rather provides a vehicle for remedying violations of other rights. More specifically, § 1983 allows a party to bring "an action at law, suit in equity, or other proper proceeding for redress," against any "person who, under color of [state law]" deprives the party of any rights "secured by the Constitution and [federal] laws." 42 U.S.C. § 1983. In other words, to succeed in a § 1983 action, the plaintiff must show that a defendant violated a right bestowed on the plaintiff by federal law, and that the defendant did so while acting "under color of" state law.

A plaintiff can sue a defendant under § 1983 in that defendant's individual capacity, official capacity, or both. As the label suggests, an individual-capacity claim is directed against the person him or herself, and the liability for the conduct extends only to that person. An official-capacity claim under § 1983, by contrast, is really a claim against the individual's employer. *Curtis v. Breathitt Cnty. Fiscal Ct.*, 756 F. App'x 519, 525 (6th Cir. 2018) ("An official capacity claim filed against a public employee generally represents another way of pleading an action against the public entity that agent represents.") (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). So, for example, if a plaintiff were to sue a county law-enforcement officer in the officer's official capacity, that is for all intents and purposes a suit against the county itself. *Graham*, 473 U.S. at 166 ("[A]n official-capacity suit is, in all respects other

11

than name, to be treated as a suit against the entity."). Here, Schoonover raises three distinct § 1983 claims: (1) against Corrill in his individual capacity; (2) against Rogers in his individual capacity; and (3) against Rogers in his official capacity, which is essentially a municipal liability claim against Adams County. The Court addresses each of these in turn.

### A. Schoonover Has Not Shown A Genuine Dispute Of Material Fact Regarding His Individual Capacity Claims.

Schoonover attempts to hold Defendants Rogers and Corrill liable in their individual capacities under § 1983. To survive summary judgment on those claims, Schoonover "must set forth facts that, when construed favorably to him, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Phillips v. Roane Cnty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006)). Neither Rogers nor Corrill dispute that they were acting under color of state law, given that Defendants were employees of the Adams County Sheriff's Office, and thus state actors for the purposes of § 1983. So that means Schoonover need only show that the Defendants violated his Eighth Amendment rights.[2]

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v.*

---

[2] Although Defendants rightfully point out that Schoonover failed to specify that his claims come under the Eighth Amendment, his complaint makes clear that he seeks relief for injuries caused by violence from other prisoners. And the Eighth Amendment permits such relief. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). Accordingly, the Court construes Schoonover's Complaint as seeking relief under the Eighth Amendment.

*McKinney*, 509 U.S. 25, 31 (1993). In addition to requiring officials to provide "humane" conditions of confinement, the Eighth Amendment also "imposes duties" on prison officials, such as requiring them to "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (quoting *Helling*, 509 U.S. at 31–32). This includes a duty "to protect prisoners from violence at the hands of other prisoners." *Id.* at 833 *(*quoting *Cortes–Quinones v. Jimenez–Nettleship,* 842 F.2d 556, 558 (1st Cir. 1988)). But not "every injury suffered by one prisoner at the hands of another" results in constitutional liability for prison officials. *Id.* at 834. Instead, liability for such injuries arises only in those instances when officials are deliberately indifferent to a prisoner's safety. *Id.* at 834. Schoonover's claim thus turns on whether he can show a genuine dispute of material fact as to whether prison officials acted with that deliberate indifference.

To establish deliberate indifference, prisoner-plaintiffs must clear two hurdles—one objective and one subjective. As to the former, the deprivation that the prisoner alleges "must be, objectively, 'sufficiently serious.'" *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). In other words, the plaintiff must show that, as a matter of fact, "he is incarcerated under conditions posing a substantial risk of serious harm." *Id.*

The second hurdle requires a showing that the prison official acted with "a 'sufficiently culpable state of mind.'" *Id.* at 833. (quoting *Wilson*, 501 U.S. at 302)). That subjective state of mind occurs when a prison official "knows of and disregards an excessive risk to inmate health or safety." *Id.* at 837. And where a prisoner-

plaintiff seeks to show such knowledge by inference, the plaintiff must establish that the prison official is "both … aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and that the prison official "also dr[e]w the inference." *Id.* at 837. Thus, to mount a successful deliberate indifference claim based on inferred knowledge, "the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837).

Another way of viewing the issue is that deliberate indifference's subjective element turns on the prison official's state of mind during the alleged constitutional violation. For instance, "[a] prison official is deliberately indifferent when he acts with criminal recklessness, a state of mind that requires he act with a conscious disregard [i.e., the subjective element] to a substantial risk [i.e., the objective element] of harm to the prisoner." *Love v. Taft*, 30 F. App'x 336, 338 (6th Cir. 2002) (citing *Farmer*, 511 U.S. at 837). When evaluating the prison official's subjective mindset, the "standard is not whether there is something easy that the [defendant], with the benefit of hindsight, could have done" but instead the Court is to assess the defendant's "actions based on the information that was available … at the time." *Burwell v. City of Lansing*, 7 F.4th 456, 466 (6th Cir. 2021) (first quoting *Williams v. Mehra*, 186 F.3d 685, 692 (6th Cir. 1999) (en banc) and then quoting *Rouster v. County of Saginaw*, 749 F.3d 437, 453 (6th Cir. 2014)). What is more, even when prison officials fail to

remedy "an obvious risk of which they should have known but did not," that does not amount to deliberate indifference. *Garreston v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005). Putting that all together, a prison official must act with a state of mind akin to criminal recklessness in response to a known risk, given the information available during the incident, in order to exhibit deliberate indifference.[3]

Importantly, to make the necessary showing on deliberate indifference, prisoner-plaintiffs must satisfy *both* the objective *and* subjective elements. *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) ("A deliberate indifference claim has both objective and subjective components."). Failure on either front prevents a prisoner from imposing liability on prison officials for harm the prisoner suffered while incarcerated.

Schoonover seeks to hold the two Defendants liable for injuries he suffered during the May 18, 2016, prison attack. He claims that the record provides evidence showing a genuine dispute of material fact as to whether Defendants knew that: (1) sex offenders are often subjected to violent attacks in jail; (2) Schoonover was an at-risk sex offender; and (3) Clinton Waters, one of Schoonover's assailants, had a history of violence against other inmates, especially sex offenders. (Pl. Resp., Doc. 57, #1937–42). All of that together, according to Schoonover, shows both (1) that

---

[3] True, there is some question about whether the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), has lowered the bar such that plaintiffs "need only prove that the officers *should have known*" about the risk of harm to an inmate when mounting a deliberate indifference claim. *Burwell*, 7 F.4th at 465. But, as in the Sixth Circuit's recent opinion in *Burwell*, the Plaintiff did not raise that argument here. *See id.* at 466. Thus, the Court declines to consider whether it should depart from the subjective analysis for deliberate indifference, as articulated in *Burwell* and other Sixth Circuit cases, when neither party has raised that issue.

Defendants exposed Schoonover to a substantial risk of serious harm, thereby satisfying the objective element, and (2) that Defendants knew or should have known about that risk when they placed Schoonover in the crowded cell with Waters and the other inmate assailants, and yet consciously chose to disregard it, thereby satisfying the subjective element.

### 1. *Schoonover Fails To Show A Genuine Dispute Of Material Fact Over Whether Corrill Acted With Deliberate Indifference.*

Let's start with the subjective prong and Defendant Corrill. Schoonover argues that Corrill, an on-duty Adams County Jail officer, was aware that Schoonover faced a substantial risk of serious harm while incarcerated. Specifically, Schoonover asserts that Corrill knew about Schoonover's sex offender status and ignored the accompanying risks when he moved Schoonover to the Middle 8 cell on May 18, 2016. (*Id.* at #1941). In support, Schoonover stresses that another corrections officer, Lieutenant Poe, testified that Corrill knew about Schoonover's sex offender status. (*Id.* at #1940). Schoonover also contends that Corrill knew about Waters' propensity for attacking sex offenders, in part because Corrill had responded to a recent incident where Waters victimized Michael Sapp, a different sex offender inmate, as well as Waters' general inclination towards violence against other inmates given Waters' troubled track record at the Adams County Jail. (*Id.* at #1941).

Against this backdrop, Schoonover contends that Corrill either knew or should have known about the risk created by moving a sex offender into an overcrowded cell, especially considering that Waters would be his cellmate. (*Id.*). Thus, by ignoring that risk and moving Schoonover into the Middle 8 cell, Corrill allegedly acted with

deliberate indifference towards Schoonover's safety, in turn violating Schoonover's Eighth Amendment right. What is more, Schoonover stresses that Corrill was in charge of monitoring the surveillance cameras and performing observation checks during the incident. So Corrill, according to Schoonover, either knew or should have known about the beating, especially given the visible injuries that Schoonover sustained while Corrill was on duty. (*Id.* at 1941–42). According to Schoonover, that means Corrill's failure to intervene reflected deliberate indifference to the attack on Schoonover and the resulting injury.

In analyzing Schoonover's arguments, the Court starts from the proposition that Corrill's alleged knowledge that Schoonover was a sex offender, and thus at risk of being attacked by other inmates, in and of itself, does not give rise to a heightened duty to protect under the Eighth Amendment. *Thomas v. Erdos*, No. 1:16-cv-793, 2018 WL 3716894, at *4 (S.D. Ohio Aug. 3, 2018) ("The fact that prison officials considered [a prisoner] … generally vulnerable to harm because of the nature of his crime, is not sufficient in and of itself to give rise to a duty to protect under the Eighth Amendment.") (citing *Kennedy v. Wilson*, No. 10-CV-299-HRW, 2013 WL 5234435, at *9 (E.D. Ky. Sept. 17, 2013); *King v. Banks*, No. 2:10-cv-852, 2012 WL 2891264, at *4 (S.D. Ohio July 13, 2012) ("[I]t is almost always the case that prison officials know that sex offenders, especially those whose crimes involve children, may be targets of assault for just that reason. But it is not the law that prison officials thereby become liable every time such an inmate is assaulted."). Rather, Schoonover must present evidence of further circumstances to support an inference of deliberate indifference,

17

for example, that Schoonover "fit[] a profile of those especially vulnerable to attack" or that the "prison guard [chose] to publicize the nature of [the] inmate's crime and admits knowing that such information, when spread to other jail residents, creates a significant risk or attack [sic]." *Id.* That means prisoners who have committed a sex crime, absent more, do not put their jailors on notice about a safety threat warranting enhanced attention or protection under the Eighth Amendment.

In a similar vein, a corrections officer's decision to house a prisoner with an inmate known to be dangerous typically does not, in and of itself, satisfy the subjective component of deliberate indifference. In *Klebanowski v. Sheahan*, 540 F.3d 633 (7th Cir. 2008), an inmate attacked a prisoner and that prisoner then informed officers that he was afraid for his life. But that request for protection, even when coupled with the officers' knowledge of the first attack, did not show that the officers subjectively knew about the risk of housing that prisoner and his former assailant together. *Id.* at 639. According to the Seventh Circuit, absent indicia of future violence, those officers were not deliberately indifferent in refusing the prisoner's request to be transferred. *Id.* More generally, the court reasoned that prisoners cannot rely on previous jail-cell attacks to show officers' knowledge that future violence would likely occur. *See King*, 2012 WL 2891264, at *4.

True, there are some limited intake scenarios where prison officials may be aware of a severe risk to the prisoner at the outset of incarceration and thus need to take some protective action. *See, e.g.*, *Estate of Clark v. Walker*, 865 F.3d 544, 553 (7th Cir. 2017) (holding that because "[r]isk of suicide is a serious medical need," a

prison official's decision to "do nothing" to protect an inmate with a "maximum risk of suicide" amounted to deliberate indifference). In other words, there are some risks that are so inherently obvious that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Rouster*, 749 F.3d at 447. And in those cases, a risk's obviousness can suffice to establish a prison official's deliberate indifference, at least for the purpose of surviving summary judgment.

Even so, merely knowing that an inmate faced a risk of suffering harm does not necessarily expose prison officials to liability, especially when they were "not subjectively aware" of the prisoner's "suffering." *Rouster*, 749 F.3d at 450 (declining to find officials deliberately indifferent when they knew the prisoner might be suffering from alcohol withdrawal, but failed to respond to the prisoner's complaints leading up to his death from a perforated duodenal ulcer). That is why prison officials who fail to take protective measures regarding at-risk inmates are typically not liable for deliberate indifference, even when the at-risk inmate incurs serious harm. *See, e.g.*, *Burwell*, 7 F.4th at 470–71 (finding that corrections officer tasked with cell checks was not deliberately indifferent by failing to (1) monitor the inmate's health status, despite the inmate being on the "watch closely list," and (2) notice him lying unconscious in vomit after suffering an overdose); *Winkler v. Madison County*, 893 F.3d 877, 898 (6th Cir. 2018) (rejecting plaintiff's deliberate indifference claim against prison official who did not investigate why a prisoner failed to get up for breakfast despite knowing the prisoner was withdrawing from drugs, because failing

to act was at most negligent and did "not reach the high standard of deliberate indifference" absent "evidence that [the prison official] perceived a substantial risk of serious harm to [the prisoner]"). All said, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment" sufficient to establish deliberate indifference. *Id.* (quoting *Farmer*, 511 U.S. at 838). In other words, a prison official is generally not liable, at least under the Eighth Amendment, for failing to (1) predict potential risks or (2) remedy ongoing harms that befall prisoners without the prison official's knowledge, except perhaps in cases involving a harm so obvious that to ignore it would be criminally reckless.

The Sixth Circuit's decision in *Taylor v. Mich. Dept. of Corrs.*, 69 F.3d 76, 83–84 (6th Cir. 1995), provides an example of such an obvious risk. There, prison officials were charged with knowledge that a "smaller, youthful prisoner" being moved into a facility with a high incidence of rapes would create an obvious risk of rape. That result followed because (1) a reasonable corrections officer would know that "smaller, youthful prisoners" are generally at higher risk, and (2) the fact that a given prisoner is "smaller" and appears "youthful" would be obvious to the other prisoners. Thus, in placing the prisoner in the prison population, the risk is both inherent and obvious to the guard.

But other conditions that create safety risks—unlike a small stature and youthful appearance—do not announce themselves to other prisoners. Consider Schoonover's sex offender status. The *fact* that he was a sex offender is not what

20

created the risk. Rather, it is the other prisoners' *knowledge* of that fact that would put Schoonover at risk of harm. Thus, the question is not whether a prison guard knew that Schoonover was a sex offender, but rather whether the guard had (or can be charged with) the knowledge that other prisoners *knew* of Schoonover's sex-offender status that matters for deliberate indifference purposes.

Schoonover has failed to identify any evidence that shows that Corrill knew that other prisoners learned of Schoonover's sex-offender status, so actual knowledge is a non-starter. Thus, Schoonover must point to record evidence showing that Corrill should have known that other prisoners learned of Schoonover's prior sex-offense conviction. But Schoonover falls short there, as well. Indeed, the record facts support the *opposite* conclusion. Start with the fact that Schoonover and Waters *shared a cell for five days* without incident prior to their reassignment to the Middle 8 cell. Because Schoonover and Waters had cohabitated peacefully for some time, Corrill had no reason to believe Waters harbored malice towards Schoonover. So, unlike the known suicide risk in *Walker*, the risk of harm from housing Corrill with Waters (and other inmates who, like Waters, might have possessed a known or predictable animus towards sex offenders) was not plainly ascertainable when Schoonover was reassigned to the Middle 8 cell.

It appears that Sturgill learning about Schoonover's sex offense history through a phone call triggered the inmates' attack on Schoonover. But Schoonover does not allege that Corrill (1) knew about the details of Sturgill's call, or (2) in any way knew that inmates in Schoonover's cell had learned about Schoonover's sex

offense history, or (3) discovered that animosity towards Schoonover had permeated throughout the Middle 8 cell. Thus the Court concludes that Corrill had no "actual knowledge of a potential danger" facing Schoonover when placed in the cell with Waters and other inmates aware of Schoonover's sex offense history. *See Farmer*, 511 U.S. at 831 (internal quotation marks omitted).

The bottom line is this—even granting that Corrill knew (1) that Schoonover was a sex offender, (2) that sex offenders generally face an increased risk of attack when incarcerated as compared to other inmates, and (3) that Schoonover's temporary cell-mate, Clinton Waters, had recent violent incidents involving other sex offenders, that combination fails to create a genuine dispute as to whether Corrill had subjective knowledge that moving Schoonover to the Middle 8 cell created a substantial risk of serious harm. In other words, when the Court focuses on what Corrill's "mental attitude actually was," *Farmer*, 511 U.S. at 839, the Court fails to see any evidence showing that (1) Corrill perceived the danger that Schoonover faced when moved to the Middle 8 cell, i.e., that Corrill learned about Sturgill's phone call and the fallout, or (2) the risk of Schoonover being beaten based on his sex offense history was obvious to Corrill.

True, perhaps Corrill did not embody the height of caution by housing Schoonover in the general prison population or with oft-bellicose Waters, but at worst that is the type of "significant risk that [Corrill] should have perceived but did not" that does not amount to deliberate indifference. *Winkler*, 893 F.3d at 898 (quoting *Farmer*, 511 U.S. at 838). Even potentially negligent "cavalier treatment of

detainees," whom Corrill, as a prison official, owed "an obligation to protect," does not establish deliberate indifference absent evidence that Corrill perceived the serious risk caused by housing Schoonover with Waters and the other inmates. *Burwell*, 7 F.4th at 471.

In short, Schoonover has not shown any basis on which the Court could infer that Corrill *knew* that other prisoners had learned of Schoonover's past crime. As a result, Schoonover is asking the Court to impose liability on Corrill based solely on Corrill's failure to predict that Schoonover's sex offender status would lead to him being attacked. But, as discussed above, prison officials have no heightened duty to protect inmates with sex offense histories, even if those inmates tend to be more at risk of jailhouse violence. In other words, Schoonover has failed to create a genuine dispute over whether Corrill subjectively perceived and then consciously disregarded that Schoonover was at a heightened risk of harm when housed in the Middle 8 cell.

Nor can Schoonover escape that problem by arguing that Corrill learned about and ignored the attack while it occurred. That is not because the argument fails as a legal matter. Rather, the problem is that Schoonover has not identified any evidence showing that Corrill knew about Schoonover's ongoing abuse while Corrill was on duty. Failure to produce evidence showing Corrill observed any attack on Schoonover or Schoonover's resulting injuries cuts against Schoonover's deliberate indifference argument. *See Young v. Campbell County*, 846 F. App'x. 314, 329 (6th Cir. 2021) ("[T]he evidence does not substantiate that Sergeant Mischell was in close enough range to perceive Young's injuries during her supervisory passes. Thus, the evidence

does not support a deliberate-indifference claim against her."). Even granting Schoonover's assertion that Corrill was the officer on duty and thus responsible for cell checks on the day of Schoonover's injury, the lack of evidence that Corrill in fact observed Schoonover's distress means that Corrill was not deliberately indifferent to Schoonover's risk of serious injury while the attack was occurring. *See Burwell*, 7 F.4th at 470–76 (finding that the prison official on duty charged with performing cell checks was not deliberately indifferent to a prisoner's overdose despite failing to perform a cell check because "she never witnessed [the inmate] in distress," but holding a different official liable for deliberate indifference because he "observed [the inmate] unconscious in a pool of his own vomit not just once, but twice").

All said, Schoonover fails to identify facts creating a genuine dispute about Corrill's subjective perception regarding the risk of moving Schoonover into the Middle 8 cell, or about Corrill's disregard of the events that occurred there. Even taking the facts in the light most favorable to Schoonover, the Court finds that Schoonover has failed to create a genuine dispute as to whether Corrill acted with criminal recklessness, i.e. with a conscious disregard to a substantial risk of serious harm, by moving Schoonover into the Middle 8 cell or when observing that cell while on duty. Because Schoonover must show both the subjective and objective component for deliberate indifference, his shortcoming on the subjective prong ends the inquiry. Thus, the Court **GRANTS** Defendants' motion for summary judgment as to Schoonover's individual capacity claim against Corrill.

2.      ***Schoonover Fails To Show A Genuine Dispute Of Material Fact Over Whether Rogers Acted With Deliberate Indifference.***

As for Sheriff Rogers, Schoonover attempts to hold him liable for policies made and implemented under Rogers' authority as Adams County Sheriff per Ohio Revised Code § 341.01. Schoonover asserts that Rogers (1) had a duty to prevent overcrowding in the Adams County Jail, and (2) knew that sex offenders tend to suffer violence while incarcerated, such that he had a duty to segregate sex offenders from the general prison population. (Pl. Resp., Doc. 57, #1937–40). And, despite that knowledge, Rogers purportedly failed to implement policies, such as a formal classification policy that required segregating sex offenders from other inmates, to protect at-risk prisoners like Schoonover. That failure to implement policies, in light of those known risks, Schoonover argues, amounts to deliberate indifference.

Generally speaking, a prisoner "has no constitutional right to be held in a specific security classification." *Merchant v. Hawk-Sawyer*, 37 F. App'x 143, 145 (6th Cir. 2002); *see also Adams v. Hardin Cnty. Detention Center*, 2016 WL 2858911, at *4 (W.D. Ky. May 16, 2016) (holding that prisoners have no constitutional right "to be incarcerated in any particular institution, a particular part of an institution, or a particular security classification, unless the state has created a liberty interest in remaining at a particular institution"). Similarly, prisoners are not typically afforded a constitutional right to reside in a prison free of overcrowding. *Agramonte v. Shartle*, 491 F. App'x 557, 560 (6th Cir. 2012) (concluding that "'extreme deprivations' must be alleged in order to support a prison-overcrowding claim" under the Eighth Amendment).

Even so, the Sixth Circuit has left open the possibility that failure to adopt a classification system might pose an unconstitutional risk to prisoner safety in some circumstances. In *Thompson v. County of Medina*, 29 F.3d 238 (6th Cir. 1994), prisoners sued a jail for failing to (1) classify prisoners as felons and misdemeanants, and (2) segregate those classes. The Sixth Circuit rejected that suit because the prisoner-plaintiffs failed to show "a sufficient inferential connection between the classification system and inmate violence to justify a reasonable fear for personal safety." *Id.* at 243. But, as the quote suggests, the Sixth Circuit rejected the argument for factual shortcomings, leaving the legal question open.

To be sure, Defendants are correct in arguing that "a lack of a classification system, alone," does not give rise to deliberate indifference. (Mot. for Summ. J., Doc. 49, #1334). But that does not rule out Schoonover's argument here. Schoonover claims that the injuries he suffered occurred because (1) he was a sex offender, (2) sex offenders are likely to be injured when housed with the general prison population, and (3) the lack of a classification system led to his jail-cell attack. So he is not relying *solely* on the county's lack of a classification system. Rather, Schoonover says that the absence of a classification system, plus the connection between the likelihood of incarcerated sex offenders suffering violence and the attack Schoonover suffered, is what gives rise to a claim. In other words, Schoonover argues that, given the known risks facing sex offenders housed within the general prison population, prison officials could infer that failure to classify and segregate sex offenders could put inmates with

sex offense histories at risk. So the Court agrees with Schoonover that *Thompson* does not bar his claim.

Still, to hold Rogers liable in his individual capacity for the cumulative effect of Rogers' policymaking efforts, Schoonover must make "a showing that [Rogers] encouraged the specific incident of misconduct or in some other way directly participated in it." *Taylor*, 69 F.3d at 81. In other words, Rogers must have "at least implicitly authorized, approved, or knowingly acquiesced" in the misconduct that resulted in Schoonover's injuries. *Harvey v. Campbell Cnty.*, 453 F. App'x 557, 563 (6th Cir. 2011) (citation omitted). So the question becomes whether Rogers' policy decisions regarding overcrowding and prisoner classification amount to "personal involvement" in the events that caused Schoonover's injuries. *Id.* To that end, "the correct inquiry is whether [Rogers] had knowledge about the substantial risk of serious harm to a particular class of persons, not whether [Rogers] knew who the particular victim turned out to be." *Taylor*, 69 F.3d at 81. So this issue does not turn on whether Rogers was present at the jail, as the parties suggest, or whether he knew about the attack on Schoonover while it was ongoing, but instead depends on whether Rogers possessed the "required knowledge of potential danger" in the Adams County Jail and deliberately ignored that knowledge in his policymaking position. *Id.*

Schoonover reasons that because Rogers knew, or should have known, about the dangers created by overcrowded prisons and failure to segregate sex offenders from the prison population, Rogers' failure to remedy those problems at the Adams County Jail amounted to deliberate indifference. Yet, "it is almost always the case

that prison officials know that sex offenders, especially those whose crimes involve children, may be targets of assault for just that reason. But it is not the law that prison officials thereby become liable every time such an inmate is assaulted." *Banks*, 2012 WL 2891264, at *4. Rather, to hold a policymaker liable for such an assault, Schoonover must present "other evidence to support a claim of deliberate indifference, such as where the inmate fits a profile of those especially vulnerable to attack, or where a prison guard chooses to publicize the nature of an inmate's crime and admits knowing that such information, when spread to other jail residents, creates a significant risk or attack." *Id.* (citations omitted).

True, perhaps Rogers had some general knowledge that sex offenders are at higher risk of injury when housed in the general prison population, especially in an overcrowded prison. But "[d]eliberate indifference is a stringent standard of fault." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 815 (6th Cir. 2005). Absent sufficient notice about a safety threat, a prison official cannot operate with the "deliberate or callous indifference caused either by actual intent or [criminal] recklessness." *Justice v. Brown*, No. 90-1239, 1991 WL 16460, at *1 (6th Cir. 1991). Here, Schoonover has not shown that Rogers knew about any such additional factors suggesting that the Adams County Jail had become especially dangerous for prisoners like Schoonover. Accordingly, he "has failed to demonstrate that the [Adams County Jail's] polices were objectively inadequate, much less that [Rogers] was deliberately indifferent to the obvious inadequacy of those policies." *Miller*, 408 F.3d at 817.

All said, Schoonover fails to show that Rogers acted with deliberate indifference towards Schoonover's safety when making policy decisions affecting the Adams County Jail. The Court **GRANTS** Defendants' Motion for Summary Judgment as it relates to Schoonover's individual capacity claims against Rogers.

## B. Schoonover Fails To Show A Custom Or Policy That Caused A Violation Of His Constitutional Rights.

By suing Sheriff Rogers in his official capacity, Schoonover effectively brings a municipal liability suit against Adams County. *United Food & Comm. Workers Local 1099 v. City of Sidney*, 364 F.3d 738, 752 (6th Cir. 2004) ("Appellants' remaining § 1983 claim is against O'Leary in his official capacity as Shelby County Sheriff, and, as the district court noted, this claim is really one against Shelby County itself."). Municipal liability under § 1983 "must be pursuant to a municipality's 'official policy,'" "that is, acts which the municipality has officially sanctioned or ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479, 480 (1986). Those official policies may be decisions, or even a "single decision," made by a municipal policymaker. *Id.*

But not all policies that result in constitutional violations give rise to municipal liability. That is, municipal liability arises only if "through its deliberate conduct" the municipality was "the 'moving force' behind the injury alleged." *D'Ambrosio v. Marino*, 747 F.3d 378, 389 (6th Cir. 2014) (quoting *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013)). To mount a successful § 1983 claim against a municipality, the plaintiff must show both that the municipality acted "with the requisite degree of culpability" and that action had a "causal link" to the alleged injury. *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997).

29

Here, Schoonover seeks to hold Adams County liable for its policies relating to inmate classification and jail overcrowding. To begin, he reasons that the overcrowding and lack of formal classification system combined to cause his move to the Middle 8 cell and the ensuing assault. (Pl. Resp., Doc. 57, #1943–45). But that proposition quickly stumbles over a post hoc logical fallacy. That is to say, Schoonover suggests that *because* prison officials moved him to the Middle 8 cell and he received a beating *after* being subject to the jail's cell-relocation policies (caused by overcrowding and lack of a classification system), those policies *caused* the beating. But an incident occurring after a defendant's action under a particular policy does not mean that the defendant's action or policy *caused* the incident. And municipal liability requires a "direct causal link between the municipal action and the deprivation of federal rights." *Id.* So Schoonover must do more than show his injuries occurred after officials implemented the Adams County Jail's cell-relocation policies.

Policies that cause jail overcrowding do not typically give rise to a constitutional violation under the "deliberate conduct" or "moving force" analysis. While crowded conditions can be restrictive and even harsh, they do not violate the Eighth Amendment unless they deprive the inmate of the "minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Thus, as mentioned above, only "extreme deprivations" can "support a prison-overcrowding claim." *Shartle*, 491 F. App'x at 560 (internal quotation marks omitted). Under that standard, the Sixth Circuit has found that overcrowding is not a constitutional violation unless it impedes on "such basic needs as food, shelter, or sanitation." *Id.*

30

Because Schoonover has not alleged such an extreme deprivation, his overcrowding argument falls short.

Similarly, as explained above, sex offenders are not entitled to enhanced protections, such as a classification system that segregates sex offenders from the general inmate population. What is more, the jail employed an informal classification system that attempted to place sex offenders in the same cells. As Defendants note, "[b]est efforts were made at the Adams County Jail to house sex offenders in either the Middle 4 or End 4 cell." (Def. Reply, Doc. 62, #1993). So, if anything, the municipality enacted a policy that exceeded its obligations by separating sex offenders from other prisoners when practicable. Thus, the Court rejects Schoonover's contention that Adams County is liable because its "decisionmakers were fully aware that sex offenders were exposed to a substantial risk of serious harm, resulting from the chronic overcrowding in the jail and the lack of a jail classification system, yet disregarded that risk." (Pl. Resp., Doc. 57, #1943). The County had a policy in place, albeit a flexible and informal one, and Schoonover fails to support his claim that sex offenders must be segregated from other prisoners at all times, or else the prison has violated their Eighth Amendment right. Indeed, the law is clear that sex offenders have no constitutional right to segregated incarceration, merely based on their classification as such. *See King*, 2012 WL 2891264, at *4.

That leaves only Schoonover's contention that Adams County is liable because Rogers ratified his deputy's conduct. Schoonover reasons that Rogers' failure to investigate Schoonover's beating and its causes, as well as Rogers' failure to discipline

Corrill for the incident, equates to endorsing the conduct. (Pl. Resp., Doc. 57, #1950–52). To be sure, "if the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). And a policymaker's failure to investigate or punish subordinates can, in some scenarios, produce municipal liability. *Wright v. City of Euclid*, 962 F.3d 852, 882 (6th Cir. 2020) ("A plaintiff can establish municipal liability by showing that the municipality ratifies the unconstitutional acts of its employees by failing to meaningfully investigate and punish allegations of unconstitutional conduct.").

But, to establish municipal liability under a theory that a supervisor's failure to investigate or punish amounted to ratification, a plaintiff must show that the "failure to investigate and punish the officers involved in those uses of force led in any way to [plaintiff's] injuries." *Id.* Schoonover does not allege that either Rogers or Adams County had a policy of failing to investigate or punish correctional facilities staff when prisoners suffered injuries at the hands of other incarcerated persons. So, given the lack of similar incidents to Schoonover's abuse, the Court cannot find that Adams County had a policy of failing to investigate or punish correctional facilities staff who violated their constitutional duty to protect prisoners. In addition, failure to investigate or punish Adams County Jail staff for Schoonover's incident necessarily occurred *after* the attack on Schoonover, and thus could not have caused his injuries.

Finally, Schoonover does not address ratification, i.e., Rogers' failure to investigate or punish his subordinates, in his Complaint, and instead raises it for the

first time in his Response to Defendants' Motion for Summary Judgment (Doc. 57). So even if Schoonover's ratification theory carried water, it would fail as waived. *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) ("A non-moving party plaintiff may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion. At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Rule 15(a).") (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2723 (3d ed. Supp. 2005)).

Because Schoonover has not identified a genuine dispute of material fact that a deliberate municipal policy caused the deprivation of his constitutional rights, his official capacity claim against Rogers (and thus Adams County) cannot succeed. Thus, the Court **GRANTS** summary judgment in Defendants' favor on the official capacity and municipal liability issues.

## CONCLUSION

For the reasons above, the Court **GRANTS** Defendants' Motion for Summary Judgment (Doc. 49). The Court holds as a matter of law that Defendants are not liable under § 1983 in their individual or official capacity. The Court directs the clerk to enter judgment accordingly.

**SO ORDERED.**

September 30, 2021
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**